UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>v.<br><br>TYVON MAURICE BROOKS,<br><br>    Defendant. | Case No. 21-20369<br>Honorable Laurie J. Michelson |

**OPINION AND ORDER ON DEFENDANT'S
MOTION TO SUPPRESS [25]**

Three Detroit police officers on routine patrol saw a white Kia Sportage without a permanent license plate drive past their squad car at a high rate of speed. They effectuated a traffic stop after the car pulled into a driveway. Tyvon Maurice Brooks exited the vehicle's driver side and left the door open. One of the officers was able to see a firearm under the driver's seat. Neither Brooks nor his passenger had a concealed pistol license.

Brooks has been indicted on one count of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) He contends that the search of the vehicle and resulting seizure of the firearm were unlawful and moves to suppress the firearm as a result. The government responds that Brooks lacks standing to challenge the search because the Kia was a rental car and Brooks was not an authorized driver, and, in any event, the gun was observed in plain view and thus lawfully seized.

The Court held an evidentiary hearing on December 15, 2021. It heard from two of the police officers, an agent from the Bureau of Alcohol, Tobacco and Firearms, and Brooks. The record also includes the officers' dash cam, body cam videos, and an incident report. The totality of the circumstances supports that there was probable cause for the traffic stop and that the firearm was observed in plain view. Thus, Brooks' motion is **DENIED**.

I.

During the evening of March 23, 2021, Detroit Police Officers Otis Funches, Ryan Ruloff, and Naveed Bajpai were on routine patrol in a residential neighborhood. Bajpai was driving the squad car, Funches was in the front passenger seat, and Ruloff was in the backseat. At approximately 8:15 pm, the officers were heading north on San Juan street. The speed limit was 25 miles per hour. A white Kia Sportage passed the officers' car heading south on San Juan. Officers Bajpai and Ruloff testified, and Funches indicated in his incident report, that the Kia was traveling at a high rate of speed. Bajpai believed the car was going faster than 25 MPH and was swerving from left to right, occupying both lanes of traffic. As the Kia passed the squad car, Bajpai looked in his rear-view mirror and could not see a license plate. Thus, he turned the squad car around to effectuate a traffic stop. The officers caught up to the Kia as it was backing into a driveway and activated the squad car's overhead lights.

All three officers exited the squad car and walked toward the Kia. The driver of the Kia, ultimately identified as Brooks, was already getting out of the car and left the driver door open. The passenger of the car, Deonta Blackwell, also exited the

2

vehicle. Blackwell lived at the home where the Kia had parked. Bajpai directed him several times to get back in the car, but Blackwell did not comply. Bajpai also asked him "where's the plate at?" (Hrg. Ex. D, Bajpai video at 0:38; Ex. B, Funches video at 0:58 (asking something like "what's wrong with the plate?").) Blackwell was detained and handcuffed by Bajpai. Brooks was likewise detained and handcuffed by Fuentes. Brooks had a driver's license and advised Fuentes that he had been driving the Kia for about one month. (Hrg. Ex. B, Funches video at 1:31.)

As the occupants of the Kia were being detained, Ruloff looked into the car with a flashlight. He did a "360" on the car. He first walked to the rear of the car to see if there was a license plate. He saw a temporary license tag that was obscured by the tinted, dirty window. He then looked into the front passenger window and walked around the back of the car to the front driver's side. As Fuentes started to walk Brooks away from the Kia and to the squad car, Ruloff walked toward the Kia's open driver's door. He saw a firearm on the floorboard. He immediately asked if Brooks had a concealed pistol license (CPL). Brooks said no. Ruloff then retrieved a firearm that was protruding from under the driver's seat. (Hrg. Tr. Ex. C, Ruloff video at 1:52.) Ruloff took the gun to the squad car and told Fuentes that he found the gun in plain view. (*Id*. at 2:19–2:21.) (Ruloff then asked Blackwell if had a CPL and he too said no. Hrg. Ex. D, Bajpai video at 2:18.) Brooks was ultimately arrested for carrying a concealed weapon.

Brooks has now been charged with being a felon in possession of a firearm. (ECF No. 1.) He seeks to suppress the firearm recovered from the Kia from being used

3

as evidence against him. (ECF No. 26.) Brooks challenges the traffic stop and Ruloff's contention that the firearm was in plain view. He believes the warrantless seizure of the firearm violated his Fourth Amendment rights.

## II.

As a threshold matter, the government questions Brooks' "standing" to challenge the search of the Kia. *See Byrd v. United States*, 138 S. Ct. 1518, 1530 (2018).

The government's point is a fair one. All agree that Brooks did not rent the car and was not otherwise involved in the rental of the car. Nor was he listed as an authorized driver. True, Brooks says he was given permission to drive the car by his friend, Jaman Pitts, and Pitts told Brooks that his girlfriend had rented the car. On the other hand, ATF special agent Barry Getza interviewed Jaryt Cooper, who was the authorized renter of the Kia. (ECF No. 29-2.) According to Cooper, she let her cousin borrow the Kia, but when her cousin stopped at a gas station, the Kia was stolen. (Interestingly, when the police officers who arrested Brooks ran the car's VIN number through the law enforcement investigation network (LEIN), nothing came back to indicate the car was stolen.) Cooper says that she only ever gave permission to her cousin to drive the car. She does not know Brooks or Pitts. Given these facts, this case is quite a bit different than *Byrd v. United States*, where the Supreme Court found that the person driving the rental car had a reasonable expectation of privacy in the car because the registered renter had given him the keys and permission to drive the car. 138 S. Ct. 1518 (2018); *see also Smith*, 263 F.3d at 586 (concluding that

the unauthorized driver of a rental car had a legitimate expectation of privacy in a rented vehicle because he (1) was married to authorized driver, (2) had the renter's permission to use the car, (3) was himself a licensed driver, (4) "was able to present the rental agreement and provided the officer with sufficient information regarding the vehicle," and (5) had himself paid for the rental car); *United States v. Jenkins*, 743 F. App'x 636, 648 (6th Cir. 2018) (finding no standing to contest the search where defendant "presented no record evidence indicating that he had the renter's permission to use the [Ford] Fusion").

In the end, though, the Court need not (and does not) resolve this thorny issue. Even assuming Brooks has standing to assert a Fourth Amendment violation, the ultimate seizure of the firearm was not unlawful.

### III.

The Court begins with Brooks' argument that the traffic stop was improper. Brooks testified that just prior to being pulled over, he was parked on the side of the road talking to some women in another car. When he pulled back on to San Juan street to make the short trip to Blackwell's house, there was a speed bump in the road. Thus, says Brooks, in the short distance he traveled before passing the squad car, and considering the speed bump, it would have been impossible for his car to reach a "high rate of speed." (ECF No. 25, PageID.113.)

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[A] vehicle stop by a police officer is a seizure

5

within the meaning of the Fourth Amendment." *Bazzi v. City of Dearborn*, 658 F.3d 598, 603 (6th Cir. 2011) (internal quotation marks omitted). It is well established that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment." *United States v. Davis*, 430 F.3d 345, 352 (6th Cir. 2005). Probable cause is "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Ferguson*, 8 F.3d 385, 392 (6th Cir. 1993) (citation omitted). This determination should be made based "on the totality of the circumstances" which "includes a realistic assessment of the situation from a law enforcement officer's perspective." *Id*. (citations omitted). And it turns on "what the officer knew *at the time he made the stop*." *Id*. at 391 (emphasis in original).

The officers had a different view of Brooks' driving. Bajpai and Ruloff testified that the Kia passed them at a high rate of speed. This is consistent with Funches' police report. And it is not inconsistent with the dash cam video. The video captures the Kia passing the squad car. (Hrg. Ex. A, dash cam video at 0:02–0:04; Ex. D, Bajpai video at 0:01.) While the Court cannot discern the car's actual speed, it passes quickly enough to support the officers' testimony. Also, following the stop, the passenger in the car, Deonta Blackwell, told Bajpai that he did not know why Brooks was "driving so crazy." (Hrg. Ex. D, Bajpai video at 1:13.) Bajpai responded that is what drew his attention—that Brooks was "all left-right, left-right, driving so fast." (Ex. D, Bajpai video at 6:34–6:36.) This further suggests that the officers did not manufacture the speeding violation post-arrest to justify the stop. Speeding is a civil infraction under

Michigan law. *See* Mich. Comp. Laws § 257.627(1). Thus, the officers had probable cause to stop the vehicle. *See United States v. Townsend*, 305 F.3d 537, 541 (6th Cir. 2002) ("[A] police officer may effect a traffic stop of any motorist for any traffic infraction."); *Ferguson*, 8 F.3d at 391 ("[S]o long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment.").

Additionally, Bajpai effectuated the traffic stop because he did not see a license plate on the Kia. Under Michigan law "a person shall not operate . . . a vehicle . . . unless there is attached to and displayed on the vehicle . . . a valid registration plate." Mich. Comp. Laws § 257.255(1). The plate must usually be attached to the rear of the vehicle in a place and position that is clearly visible. *Id.* at § 257.225(1) and (2). Temporary registration plates are allowed under certain circumstances. *Id.* at § 256.226a.

After the officers stopped the Kia, they were eventually able to locate the temporary paper license. It was affixed to the back window of the car. But the window was tinted and dirty. Bajpai's explanation that the tag was not immediately apparent when the Kia drove past is credible. This, too, gave the officers probable cause to stop the car. *See United States v. Dukes*, No. 15-20769, 2016 U.S. Dist. LEXIS 89210, at *13 (E.D. Mich. July 11, 2016) (finding traffic stop lawful where troopers testified they could not see any registration plate on driver's car until after they pulled her over and saw the temporary tag in the back window of the vehicle); *see also Heien v. North Carolina*, 574 U.S. 54, 57 (2014) (reasonable mistakes of fact will not

undermine probable cause; consistent with the Fourth Amendment, "[a]n officer might, for example, stop a motorist for traveling alone in a high-occupancy vehicle lane, only to discover upon approaching the car that two children are slumped over asleep in the back seat"); *United States v. Simpson*, 520 F.3d 531, 542 (6th Cir. 2009) ("Regardless, the proper question is not whether Simpson was, in fact, violating § 55-4-110(b) by having an illegible expiration date on his temporary tag. The question is whether Officer Ratcliff had an objectively reasonable suspicion that a violation of that statute was occurring.").

Thus, the traffic stop was lawful.

## IV.

Of course, "a seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution." *Illinois v. Caballes*, 543 U.S. 405, 407 (2005). "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Davis*, 430 F.3d 345, 354 (6th Cir. 2005) (quoting *Florida v. Royer*, 460 U.S. 491, 500 (1983)); *see also United States v. Shank*, 543 F.3d 309, 313 (6th Cir. 2008) (explaining that any subsequent detention after an initial stop may not "be excessively intrusive and must be reasonably related in time to the investigation"). "Beyond determining whether to issue a traffic ticket, an officer's mission includes 'ordinary inquiries incident to [the traffic] stop.' Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration

8

and proof of insurance." *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) (quoting *Caballes*, 543 U.S. at 408).

Brooks contends that his detention exceeded the purpose of the initial stop. He first says the stop was over once the officers saw the temporary license tag, and thus, he should have been sent on his way. (ECF No. 25, PageID.113, 116.) But that disregards the speeding infraction and any inquiry into the propriety of the temporary tag, the investigation of which had only just begun. Thus, unlike the *Davis* case that Brooks relies on, the purpose of the traffic stop had not been accomplished at the time he was initially detained. *See Bradshaw*, 102 F.3d at 212 (ruling that an officer can lawfully detain the driver of a vehicle until after the officer has finished making record radio checks and issuing a citation, because this activity "would be well within the bounds of the initial stop"); *United States v. Shank*, 543 F.3d 309, 314 (6th Cir. 2008) ("Because an officer may detain an individual in a police cruiser until the officer has finished issuing a citation, Shank's detention did not exceed the scope of the stop and was therefore constitutionally permissible.").

Additionally, a seizure can be extended if "something happened during the stop to cause the officer to have a reasonable and articulable suspicion that criminal activity is afoot." *United States v. Stepp*, 680 F.3d 651, 661 (6th Cir. 2012). Here, within minutes of Funches detaining Brooks and beginning the tasks tied to the traffic infractions, Ruloff observed a firearm protruding from under the driver's seat. Under the plain-view doctrine, "if police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the

9

officers have a lawful right of access to the object, they may seize it without a warrant." *United States v. Galaviz*, 645 F.3d 347, 354 (6th Cir. 2011) (quoting *United States v. Herndon*, 501 F.3d 683, 692 (6th Cir. 2007)). All of these elements are met here.

First, recall that when the officers approached the Kia, Brooks exited the car and left the driver's door open. Ruloff was thus in a lawful position outside this open door. True, Ruloff's body cam shows him bending down to look under the seat. (Ex. C, Ruloff video at 1:41–1:44.) And to Brooks, this means the firearm was not in plain view. Ruloff does not recall whether he saw the gun before bending down for a better look. But this does not matter. "[A] motorist has 'no legitimate expectation of privacy shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passersby or diligent police officers.'" *United States v. Bradshaw*, 102 F.3d 204, 211 (6th Cir. 1996) (quoting *Texas v. Brown*, 460 U.S. 730, 740 (1983)). This diligence includes the use of a flashlight or changing positions for a better view. *See United States v. Willis*, 37 F.3d 313, 316 (7th Cir. 1994) (holding that seizure of firearm was authorized by plain view where officer crouched near the ground and shone a flashlight into the car through the open driver's door); *see also Brown*, 460 U.S. at 739–40 (finding that an officer's use of a flashlight to illuminate the interior of a vehicle does not infringe upon the rights secured by the Fourth Amendment, even where the officer bent down to see what was inside the vehicle, as the general public could peer into the vehicle from any number of angles). Also, Ruloff's body cam captures the gun protruding from the driver's seat. (Ex. C,

10

Ruloff video at 1:44, 1:52.) The present record provides no reason to doubt that Ruloff was able to see the gun through the open driver's door.

Next, it is a crime in Michigan to carry a pistol in a vehicle without a firearm license, Mich. Comp. Laws § 750.227, and the burden of establishing possession of a license is on the defendant, Mich. Comp. Laws § 776.20. Thus, the Sixth Circuit has found that the incriminating nature of a handgun in a vehicle in Michigan is immediately apparent. *Galaviz*, 645 F.3d at 355–56. In other words, said the Court, "[i]f officers were able to clearly identify the object protruding from beneath the driver's-side seat as part of a handgun, then this prong of the plain-view test is satisfied." *Id.* at 356. Ruloff testified that he saw numerous parts of the pistol and enough for him to recognize that it was a firearm. So this element is satisfied. *See United States v. Campbell*, 549 F.3d 364, 373 (6th Cir. 2008) (seizure of firearm upheld under plain view exception where officer saw butt of handgun protruding from under passenger seat through open passenger door during *Terry* stop).

As for the final element—a lawful right of access to the interior of the car so as to seize the gun—the Sixth Circuit has found that it "turns on application of the automobile exception." *Galaviz*, 645 F.3d at 357. This exception "allows a warrantless search of an automobile if officers have probable cause to believe the vehicle contains evidence of a crime." *Id.* And here, "that probable cause was supplied when officers viewed the gun in the car, which constitutes a violation of Mich. Comp. Laws § 750.227." *Id.*; *see also Boone v. Spurgess*, 385 F.3d 923, 928 (6th Cir. 2004) (finding requirement that "the officer have a lawful right of access to the object, is meant to

11

guard against warrantless entry onto premises whenever contraband is viewed from off the premises in the absence of exigent circumstances, but does not bar the seizure of evidence in a parked car").[1]

After observing the gun in plain view, Ruloff immediately asked whether Brooks had a CPL as Brooks was being led to the squad car, where Funches was to begin the routine tasks associated with the traffic stop. This included inquiries regarding Brooks' license and the car's VIN and license plate. Funches also determined, through a LEIN inquiry, that Brooks did not have a CPL. At that time, there was probable cause for the arrest. *See United States v. Lamb*, No. 16-20077, 2016 U.S. Dist. LEXIS 105217, at *10–11 (E.D. Mich. July 6, 2016) ("Ample authority demonstrates that [Officer] Gardner had probable cause to arrest Lamb based upon his possession of the gun, and that Lamb carried the burden of producing proof that he had a CPL license. Lamb did not carry that burden because he never produced a CPL license." (citations omitted)), adopted by, 2016 U.S. Dist. LEXIS 104609 (E.D. Mich. Aug. 9, 2016).

Brooks disagrees. He contends his initial detention amounted to an arrest without probable cause. He focuses on the fact that Funches immediately put him in handcuffs. But handcuffing is not necessarily an arrest. The Sixth Circuit has made clear that handcuffing as a safety precaution "is appropriate even when police are merely detaining, but not arresting, a suspect." *United States v. Atchley*, 474 F.3d

---

[1] Brooks argues that the automobile exception does not apply when, as here, the driver has exited the car and the car is no longer mobile. (ECF No. 25, PageID.116–117.) But that was the very situation in *Galaviz*.

12

840, 849 (6th Cir. 2007). "[T]he use of handcuffs [does not] exceed the bounds of a *Terry* stop, so long as the circumstances warrant that precaution." *Houston v. Clark Cnty. Sheriff Deputy John Does 1-5*, 174 F.3d 809, 815 (6th Cir. 1999).

But was handcuffing Brooks in fact a safety precaution or otherwise warranted under the circumstances? Funches did not testify at the suppression hearing, and his police report does not explain why he placed Brooks in handcuffs. And Brooks was pulled over for two relatively minor traffic infractions that do not bespeak danger. True, both passengers had exited the car which could have caused the officers some concern. Funches told Brooks to keep his hands raised and to not reach in the car. When Brooks put his hands in his pockets to retrieve something, Funches reacted. (Hrg. Ex. B, Funches video at 0:38–47.) And the car's passenger (Blackwell) refused to obey Bajpai's orders to get back in the car. But it is not known whether Funches gave similar orders to Brooks. And nothing suggested that Brooks was armed.

But even if the handcuffing, as part of the proper *Terry* stop, was excessive or rose to the level of an arrest, that does not mean the seizure of the firearm was unlawful. Once Brooks, on his own, exited the car and left the door open, Ruloff was lawfully in a position from which to view the firearm. *See Bradshaw*, 102 F.3d at 211. The seizure of the firearm was not related to Brooks' handcuffing, i.e., it was not the fruit of an unlawful arrest. In other words, "[e]ven assuming [Brooks] was illegally arrested at the time the [Kia] was stopped, it was the investigatory stop— and not the illegal arrest—" that resulted in the seizure of the firearm. *See United States v. Garcia*, 496 F.3d 495, 503 (6th Cir. 2007); s*ee also Willis*, 37 F.3d at 316 (finding that

13

even if the initial stop of the defendant was unjustified, the officer was permitted to seize a gun observed in plain view in the defendant's car and arrest the defendant for unlawful possession of a firearm); *United States v. Bellinger*, 343 F. Supp. 2d 417, 420 (E.D. Pa. 2004) (finding no need to decide whether defendant's detention was an arrest or *Terry* stop because once defendant "was out of the car, the butt of the gun was in plain view through the open door from outside of the car").

In sum, the firearm was recovered early in the stop and only after Ruloff observed it in plain view. Brooks did not have a concealed pistol license. Thus, the arrest was supported by probable cause and did not violate the Fourth Amendment.

## V.

For all of these reasons, Brooks' motion to suppress evidence for unlawful search and seizure (ECF No. 25) is DENIED.

IT IS SO ORDERED.

Dated: January 3, 2022

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE
